# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 3, 2017

## IN RE: CANDICE H., ET AL.

**Appeal from the Juvenile Court for Montgomery County**
**No. 16-JV-380, 16-JV-381, 16-JV-382      Tim Barnes, Judge**

_____

### No. M2016-02305-COA-R3-PT

_____

This appeal arises from the termination of a father's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Montgomery County ("the Juvenile Court") seeking to terminate the parental rights of Jeffrey H. ("Father") to his minor children Candice, Danonie, and Izabella ("the Children"). The Children had entered DCS custody after a domestic incident between Father and the Children's mother. After a trial, the Juvenile Court entered an order finding by clear and convincing evidence that grounds existed to terminate Father's parental rights and that termination is in the Children's best interest. Father appealed. Finding it inapplicable to putative biological parent Father, we reverse the ground of failure to establish paternity found as regards the child Danonie. We affirm the rest of the Juvenile Court's judgment terminating Father's parental rights to the Children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

Daniel P. Bryant, Clarksville, Tennessee, for the appellant, Jeffrey H.

Herbery H. Slatery, III, Attorney General and Reporter, and, Jordan K. Crews, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## Background

In May 2014, Father and the Children's mother had a domestic incident in a car which was pulled to the side of the road. The Children[1] and two half-siblings were present. The parents allegedly were under the influence of alcohol. Father tested positive for marijuana when the Children entered custody. In July 2014, the Children were adjudicated dependent and neglected due to their being exposed to drug abuse and domestic violence. The Children have been in DCS custody since the 2014 domestic incident.

Permanency plans were entered for Father. Father was required to pay $10 per month in child support for each of the Children. The permanency plans contained a number of requirements for Father, including: attend domestic violence classes and provide documentation; participate in random drug screens; and obtain appropriate housing.

In April 2016, DCS filed a petition seeking to terminate Father's parental rights to the Children.[2] This matter was tried in July 2016. The bulk of the testimony at trial came from DCS family service worker Taylor Brown ("Brown"). Brown took over the Children's case in October 2015. Brown testified that Father is the legal Father of Candice and Izabella, and the alleged father of Danonie. Brown stated that records reflected no child support paid by Father for the Children. Brown testified that during the relevant four-month period between December 4, 2015 and April 3, 2016, there was no reason why Father could not pay child support. Brown stated further that Father is capable of working and currently works for a landscaping company. Brown stated that in the four months after removal and in spite of DCS efforts to assist him, Father made no attempt to remedy the reasons that the Children entered custody in the first place. Brown stated that in all the time the Children have been in custody, Father never has provided a suitable home for the Children. Brown testified Father maintained only sporadic visitation with the Children. Brown stated further that she was not aware of Father being involved in the Children's medical, dental, school, or psychological appointments.

Continuing her testimony, Brown testified that Father was inconsistent at participating in drug screens. Father failed to appear for a number of drug screens, resulting in testing "positive by default." Brown was not aware that Father had attended any domestic violence classes. Brown stated that Father completed a clinical assessment,

---

[1] Candice was born in 2006; Danonie in 2007; and Izabella in 2013.

[2] The Children's mother's parental rights also were terminated as were those of certain additional men, but only Father appealed.

but "that's it." As to the Children's current environment, Brown testified that the Children had bonded well with the foster family. Finally, regarding Father's temperament, Brown stated that Father cursed her on occasion and made her feel uncomfortable around him.

The Foster Father testified. Foster Father serves in the U.S. Army. Foster Father stated his willingness to adopt the Children should they become available for adoption. Foster Father testified as to his intentions concerning the Children:

> My long-term vision for them would be staying with as if they were my biological children. I would nurture them and expect them to be successful young adults going to college, having successful careers, whether that's military service or, you know, something -- some level of public service. I don't see any of the kids having an issue with going to college and being successful in life. They are very academically inclined, so I think they have a bright and successful future ahead of them.

Father testified. Father testified regarding his participation in the case, particularly in regard to the allegations of an anger problem and drug abuse:

> Q. Okay. And the recent failure for benzos, do you have [an] explanation for that?
> A. Yes. I went to the emergency room with muscle spasms, and they give me three different types of medicine.
>
> ***
>
> Q. (By Mr. Bryant) [Father], have you taken any over-the-counter drugs since that time?
> A. I take ibuprofen every now and again.
> Q. Okay. For the same muscle issues?
> A. Yeah.
>
> ***
>
> Q. Okay. And as far as these classes and these assessments, have you done any of these assessments that DCS has been talking about so far in this case?
> A. I did the clinical, but Ms. Taylor keeps saying she's going to put in the paperwork. Every time I ask her, she'll say she's going to put in the

paperwork. I can't do it, because I ain't got no insurance, and I've got to wait on her to put in the paperwork, but she ain't done it yet, so I can't.

Q. And which class was that?

A. It's the A&Ds, the domestic -- everything but the clinical.

Q. Okay. You've done the clinical assessment?

A. Yes.

Q. Okay. And when the prior worker was on the case, did you do any of the A&D -- did you do an A&D assessment at all during this case?

A. When Mr. Vega [the previous caseworker] had it, he didn't tell me I had to do no A&D assessment and no domestic.

Q. Okay.

A. That came about when she got the case.

Q. Okay. Did you ever go to any other facility for any other assessment?

A. I went to Bradford like four different times when they said they sent the stuff to them, but they said they never got it.

Q. Okay. So you went to Bradford four times?

A. Yeah.

Q. Do you recall when you did that?

A. I can't remember the exact date, but it was last year.

Q. In 2015?

A. Yeah.

Q. Is there any illegal activity happening in your home?

A. Not that I know of.

Q. Have you had any sort of criminal legal problems since you got out of jail?

A. No.

Q. And that was in the middle of 2015; is that right?

A. Yeah.

Q. And do you see anything that would prevent you from caring for the kids if you were given that opportunity?

A. No, sir.

Q. Is there anything else you would like to add as far as what you have been accused of in this case?

A. Well, I mean, they are trying to say I ain't doing what they want me to do. I mean, they ain't offered me the help. You know, they say they are, but they ain't doing it.

On cross-examination, Father testified further:

Q. Okay. But you don't feel like you have an anger issue?

A. No, ma'am.

-4-

Q. Since you've been arrested and found guilty the multiple times that you've been arrested and were found guilty, have you attended any kind of anger management classes?

A. No, ma'am.

Q. Any kind of domestic violence classes?

A. No, ma'am.

Q. Have you addressed your anger in any way?

A. I don't think I have an anger problem.

***

Q. Okay. You said that the A&D treatment you had, you have been to Bradford a couple of times, but you said you also couldn't afford to pay for it. You have been to Bradford. At Bradford the A&D treatment is free.

A. Yeah. I've been there, like, four times.

Q. Okay. So --

A. They told me that they've sent it to you-all.

Q. Okay. So the Bradford A&D assessment and drug treatment, was that free that you did?

A. Yeah.

Q. Okay. Do you have any documentation before the Court today that you completed that?

A. No. They said after six months they get rid of it.

Q. Okay. Did you attempt, when you had it done, to get any kind of documentation?

A. They don't give it to me. They send it to you-all.

Q. Did you request a copy?

A. That's what they told me. They send it to you-all.

Q. Okay. But you have no documentation before the Court today that it ever happened?

A. No, ma'am.

In October 2016, the Juvenile Court entered its final judgment terminating Father's parental rights to the Children on the grounds of: willful failure to support; failure to provide a suitable home; substantial noncompliance with the permanency plan; persistence of conditions; and, failure to establish paternity. During trial, DCS nonsuited its alleged ground of willful failure to visit. The Juvenile Court also found that termination of Father's parental rights is in the Children's best interest. In its detailed final judgment, the Juvenile Court found and held, as pertinent:

[Willful failure to support]

-5-

The Court finds by clear and convincing evidence that Ground Number One is appropriate, based on the Father . . . abandoning the children for failing to support. [Father] was required to make payments in support of his children by the permanency plans adopted as an order of the Court on October 29th, 2013, and April 24th, 2014. [Father] signed the termination of parental rights criteria, which advise him of his duty to support his children, on June 3rd, 2014, and on May 21st, 2015. [Father] was aware of his obligation to support his children, knew that it was a ground to terminate his parental rights, and still willfully failed to support his children. The Court finds that [Father] is able-bodied and capable of working and earning enough to support himself and pay child support. [Father] was not in jail or incapacitated in the four months before the petition was filed, so he could have worked in order to support the children. The Court finds by clear and convincing evidence that the Father . . . failed to pay for the child during the statutory period, and therefore, grants the termination of [Father's] parental rights based on this ground.

***

[Failure to provide a suitable home]

In the four months after the removal of the children and even in the twenty-two months after the removal of the children, [Father] has not made even minimal efforts to improve his home and personal condition. He was advised on June 3rd, 2014, on May 21st, 2015, and throughout the court proceedings that a failure to make reasonable efforts to provide a suitable home for the children in the first four months would be grounds for termination of her parental rights. His lack of concern for the children is to such a degree that it appears unlikely he will be able to provide a suitable home for the children at an early date.

The Court also finds that, notwithstanding the DCS efforts to assist [Father], he has not proven that he has made reasonable efforts to properly care for the children and provide a safe, stable home. DCS requested that [Father] provide a denial letter for TENNCARE so that DCS could submit a PSG to help pay for services. [Father] did not provide this denial letter until December 18th, 2015, and the letter was dated November 10th, 2015. [Father] has failed to maintain regular contact with DCS, and [Father] has not maintained regular contact with his children or appointments for his children. [Father] has failed to present himself to DCS for random drug screens, and he has also failed to complete services that would address the Department's Alcohol and Drug apprehensions concerning [Father].

[Father] has been arrested on multiple occasions throughout this custodial episode, and he has failed to provide an address for DCS so that it might complete walk-through of his home.

***

[Substantial noncompliance with the permanency plans]

Despite continuous efforts on behalf of DCS, [Father] has not substantially complied with the responsibilities and requirements set out for him in any of the permanency plans. [Father] has not made any child support payments whatsoever, has not maintained regular visitation with his children, has not been involved at all in the children's school, medical, dental or emotional appointments, has consistently failed drug screens, has not reported for random drug screens, has not attended domestic violence classes, has not completed A&D treatment, has not provided a legal means of income, has not maintained contact with DCS, has not acquired appropriate and stable housing, has not participated in the children's therapy, has not completed a clinical assessment, and has not been able to implement any of the skills because he has not completed services.

***

[Persistent conditions]

This is the second custodial episode for this family since 2013. The children were removed from the same home in 2013 due to Krystal [C's] and [Father's] drug use and were adjudicated dependent and neglected based on this drug use. DCS removed the children from their home again on May 21st, 2014, because Krystal [C.] and [Father] had a domestic incident with the children in the car. Both parents were deemed to be under the influence of alcohol. The oldest child reported that she had witnessed her mother driving under the influence on multiple occasions. The child also reported that she is terrified to return to the home of Krystal [C.] and [Father]. [Father] admitted to using drugs and tested positive for THC at the time that the children came into custody . . . .

***

The Court finds that the conditions that led to the removal still persist as to [Father]. DCS requested that [Father] provide a denial letter for TENNCARE so that DCS could submit a PSG to help pay for services. [Father] did not provide this denial letter until December 18th, 2015, and the letter was dated November 10th, 2015. DCS has attempted to stay in

contact with [Father] in order to set him up with services, but he has failed to maintain regular contact with DCS. [Father] has not maintained regular contact with the children or attended any appointments for the children. [Father] has failed to report for random drug screens and has failed to complete services that would address the Alcohol and Drug concerns that DCS has for [Father]. [Father] has been arrested on multiple occasions throughout this custodial episode and has failed to provide and address for DCS to do a walk-through of his home.

Based on these observations, the conditions that necessitated foster care for the children persist. Based on the history with this family . . . [Father's] lack of effort to have any contact with his children, there is little chance that these conditions will be remedied soon so that the children can be safely returned to the home. Therefore, prolonging the parent/child relationship clearly diminishes the children's chances of early integration into a safe, stable home.

***

[Failure to establish paternity]

In this case, the Court finds that, based on the testimony of FSW Brown, there is clear and convincing evidence that [Father] made no efforts to legitimate the child Danonie [H.] before the filing of the petition. [Father] has failed, without good cause or excuse, to make reasonable payments toward the support of the child in accordance with the child support guidelines, has failed to visit with the child, has failed to manifest an ability and willingness to assume legal and physical custody of the child, and failed to file a petition to establish paternity after claiming paternity to the child. This Court finds that [Father] has shown no interest in the welfare of his child, Danonie [H.]. Additionally, placing custody of Danonie [H.] with [Father] would pose a substantial risk of harm to the child's physical and psychological welfare, as [Father] has not completed any of the tasks on the permanency plan and Danonie [H.] has bonded with his foster parents.

***

[Best interest]

The Court finds that [Father] has not made the changes in his circumstances that would make it safe for the children to go home. He has not made any lasting changes in his conduct, even given DCS's reasonable

-8-

efforts to help him make these changes, so it does not appear that lasting change is reasonably possible. [Father] has not maintained regular visitation with his children. He has a history of alcohol and drug abuse and has consistently failed drug screens, right up until days before this hearing, during the duration of his children's custody, rendering him unable to care for the children in a safe and stable manner. His mental and emotional state and his history of perpetrating domestic violence are detrimental to the welfare of the children and would prevent him from effectively parenting the children. [Father] has not paid any child support and has shown no interest in the welfare of his children.

Father timely appealed to this Court.

## Discussion

Although not stated exactly as such, Father raises the following issues on appeal: 1) whether the Juvenile Court erred in finding the ground of willful failure to support; 2) whether the Juvenile Court erred in finding the ground of failure to provide a suitable home; 3) whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan; 4) whether the Juvenile Court erred in finding the ground of persistence of conditions; and, 5) whether the Juvenile Court erred in finding that termination of Father's parental rights to the Children is in the Children's best interest. Despite not being raised by Father, we address also, as we must, the ground found by the Trial Court coming under the putative father grounds at Tenn. Code Ann. § 36-1-113(g)(9)(A) as regards the child Danonie.

As our Supreme Court has instructed regarding the standard of review in parental termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id*. at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id*.; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

"enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 526-27 (footnote omitted). As such, we review each of the grounds for termination.

Five grounds for termination of parental rights are implicated on appeal. As pertinent, Tenn. Code Ann. § 36-1-113(g)(1) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2016).

Regarding willful failure to support and failure to provide a suitable home, Tenn. Code Ann. § 36-1-102 provides:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

-13-

(ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(i-ii) (Supp. 2016).

Regarding substantial noncompliance with the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2) provides:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2016).

As to persistence of conditions, Tenn. Code Ann. § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to

-14-

further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or guardian or guardians, still persist;

  (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

  (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2016).

Finally, regarding the putative father ground, the statute provides:

(9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:

(i) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;

(ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

(iii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102(1);

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

-15-

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3);

Tenn. Code Ann. § 36-1-113(g)(9)(A) (Supp. 2016).

We first address whether the Juvenile Court erred in finding the ground of willful failure to support. While apparently no child support order was entered with respect to Father, a ratified permanency plan did require Father to pay $10 per month for each of the Children. In any event, Father's duty to provide child support existed. Father's only support, however, consisted of a few dinners and gifts. The Juvenile Court made specific findings as to Father being able-bodied, out of jail during the relevant four month period from December 4, 2015 through April 3, 2016, and capable of working. The evidence in the record is that Father works in landscaping and performs seasonal work. Brown testified to Father having no known constraints on his ability to work.

Father does not argue that he was unable to work but rather that his work is seasonal and that he was unemployed in the relevant time frame. This will not suffice. Clear and convincing evidence shows, as found by the Juvenile Court, that although Father was capable of working so as to support the Children, he chose not to do so. We find, as did the Juvenile Court, that the ground of willful failure to support is established by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to provide a suitable home. As relevant to this ground, the Children were removed from the home on May 21, 2014. Afterwards, DCS set up clinical and A & D assessments, informed Father about available domestic violence classes, and offered transportation. However, Father never took a domestic violence class. Father failed to keep in touch with DCS and provide an address. At the time of trial, Father lived with the mother in a trailer without a lease. Despite DCS's reasonable efforts as required by statute as to this ground, Father essentially did nothing to prepare a suitable home for the Children. The evidence in the record on appeal is that DCS offered reasonable assistance to Father but he took no affirmative steps on his own toward providing a suitable home for the Children that is free of drug abuse and domestic violence. We find, as did the Juvenile Court, that the ground of failure to provide a suitable home is proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan. The Juvenile Court made its

-16-

findings, quoted above, relative to this issue and Father's failure to complete substantial portions of the permanency plans' responsibilities. Father on appeal asserts that he completed an A & D assessment. Father asserts further that DCS did not even know where the parents lived during the majority of the case. Nevertheless, crucially, Father never completed domestic violence classes. Domestic violence was a central reason for the Children entering DCS custody in the first place. Regarding housing, we already have stated our disagreement with Father's characterization of DCS's efforts in this case. Moreover, it is not at all unreasonable to expect Father to exert some affirmative effort on his part to provide a suitable home. It not only was DCS's duty to extend reasonable assistance regarding housing, it also was Father's responsibility to act on that assistance. Father scarcely tried. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan is established by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of persistence of conditions. The Children were removed from the home of Father for at least six months, and the Children have been adjudicated dependent and neglected. This ground, as much else about this case, is based principally on drug abuse and domestic violence. The evidence in the record is that Father never sufficiently addressed these problems so as to return to parenting the Children. Father never completed domestic violence classes. Indeed, as quoted above, Father was adamant at trial that he does not believe he has a problem with anger, despite his having a history of domestic violence convictions as well as the fact that the Children entered DCS custody due to a domestic incident involving Father. The conditions persist in that Father never has squarely confronted his problems with anger and violence. Regarding drugs, the conditions are the same. Father tested positive for marijuana early in this case. Shortly before trial, Father tested positive for benzodiazepine. In between, Father sometimes failed even to show up for drug tests, resulting in default positive results. We find, as did the Juvenile Court, that the ground of persistent conditions is proven by clear and convincing evidence.

Although not raised by Father, we next address whether the Juvenile Court erred in finding the ground of failure to establish paternity or exercise parentage under Tenn. Code Ann. § 36-1-113(g)(9)(A) as regards Danonie. DCS concedes straightforwardly in its brief that under binding Tennessee Supreme Court precedent in the case of *In re: Bernard T.*, 319 S.W.3d 586 (Tenn. 2010), putative biological fathers are not liable to having their parental rights terminated on the grounds provided in Tenn. Code Ann. § 36-1-113(g)(9)(A). Our Supreme Court stated: "The grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9) cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, or putative biological father at the time the termination

-17-

petition is filed." *Id*. at 599. This Court, analyzing the implications of *Bernard T.*, discussed as follows:

> The terms "putative biological father" and "putative father," however, are not currently defined by Section 102. Instead, the *Bernard* Court looked to Tennessee Code Annotated Section 36-1-117 to define the term:
>
> > Being a child's biological father is not sufficient, by itself, to qualify a man as a child's legal parent or as a child's putative biological father. A biological father will be considered to be a child's "putative biological father" only if (1) he has filed a petition to establish his parentage of the child [citing Tenn. Code Ann. § 36-1-117(b) ], (2) he has filed a timely statement with the putative father registry [citing Tenn. Code Ann. § 36-1-117(c)(1) ], (3) the child's mother has identified him as the child's biological father in a sworn, written statement [citing Tenn. Code Ann. § 36-1-117(c)(2) ], (4) he has been identified as the child's biological father by information that the court deems to be credible and reliable [citing Tenn. Code Ann. § 36-1-117(c)(2) ], (5) he has claimed to certain individuals that he believes that he is the child's biological father [citing Tenn. Code Ann. § 36-1-117(c)(3) ], (6) his name is recorded on the child's birth certificate [citing Tenn. Code Ann. § 36-1-117(c)(4) ], (7) he is living openly with the child and holding himself out to be the child's father [citing Tenn. Code Ann. § 36-1-117(c)(5); Tenn. Code Ann. § 36-2-304(a)(4) ], or (8) he has entered into a permanency plan or plan of care under Tennessee law or under similar laws of other states or territories. [citing Tenn. Code Ann. § 36-1-117(c)(6) ].
>
> *Bernard*, 319 S.W.3d at 598 (footnotes omitted and citations moved to text for clarity). Thus, according to the Court in *Bernard*, where a biological father engages in any of the actions contained in Section 36-6-117(b) or (c), he will be considered the child's putative biological father.

\*\*\*

In sum, the Tennessee Supreme Court in *Bernard* deemed a putative biological father on par with a legal parent or guardian and, therefore, declined to apply the grounds contained in Tennessee Code Annotated

Section 36-1-113(g)(9)(A) to putative biological fathers. In so holding, the *Bernard* Court relegated the grounds contained in Section 36-1-113(g)(9)(A) to applying only to those parents whose claims to children are so gossamer as to be virtually non-existent. *See Bernard*, 319 S.W.3d at 607 (declining to indicate what, if any, rights Junior D. had to the child whose relationship with Junior D. was ultimately terminated under Section 36-1-113(g)(9)(A)). Regardless of our concerns regarding the *Bernard* Court's interpretation of Tennessee Code Annotated Section 36-1-113(g)(9)(A), however, we are not free to depart from the Tennessee Supreme Court's unequivocal holding.

*In re Ashton B.*, No. W2015-01864-COA-R3-PT, 2016 WL 981320, at *10, 13 (Tenn. Ct. App. Mar. 15, 2016), *rule 11 appl. perm. appeal denied July 6, 2016*. (Footnotes Omitted).

DCS states that it agrees with the reservations about the *Bernard T.* holding expressed by this Court in *In re: Ashton B*. Nevertheless, *In re: Bernard T.* has not been revisited or overturned by the Tennessee Supreme Court since its filing.[6] We are obliged, therefore, to adhere to binding case precedent of the Tennessee Supreme Court. In the present case, Mother identified Father as Danonie's biological father. Father entered a permanency plan acknowledging Danonie as his child. The Juvenile Court specifically found that "[Father] is considered to be the child's putative father pursuant to TCA 36-1-117(c), as Krystal [C.] named him as the father of [Danonie]." Under the holding of *Bernard T.*, Father is a putative biological father whose parental rights to Danonie may not be terminated under Tenn. Code Ann. § 36-1-113(g)(9)(A). Finding this cumulative ground inapplicable, we reverse the Juvenile Court's finding against Father of failure to establish paternity as regards Danonie.

The final issue we address is whether the Juvenile Court erred in finding that termination of Father's parental rights to the Children is in the Children's best interest. The evidence does not preponderate against the Juvenile Court's findings relative to their best interest. Father, never properly having addressed his drug abuse or domestic violence issues, is in no position to effectively parent the Children in the foreseeable future. In contrast, the evidence at trial reflects that the Children are in a safe and stable foster home environment. We find by clear and convincing evidence, as did the Juvenile

---

[6] We note that Tenn. Code Ann. § 36-1-117 was amended by Pub. Ch. 636 (S.B. 2531), effective March 23, 2016, to delete all references to "putative biological father' and replace them with "putative father." Neither party briefed what impact, if any, the legislative changes to the putative father grounds have on this case, or as to our Supreme Court's holding in *Bernard T.* Indeed, Father did not raise the issue at all. We, therefore, accept DCS's acknowledgment of *Bernard T.* as a concession of this cumulative ground, but only for the limited purpose of deciding this appeal.

Court, that termination of Father's parental rights to the Children is in the Children's best interest.

In summary, we reverse the ground of failure to establish paternity, finding it inapplicable in this case. Otherwise, we affirm the judgment of the Juvenile Court terminating Father's parental rights to the Children.

### Conclusion

The judgment of the Juvenile Court is affirmed, in part, and reversed, in part, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Jeffrey H., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE